# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **ELIZABETH  BEE** | * | **CIVIL ACTION NO. 08-cv-0933** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## *REPORT AND RECOMMENDATION*

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED and REMANDED**.

### *Background and Procedural History*

The claimant, Elizabeth Caroline Bee ("Bee"), now 45 years old, filed an application for a

period of disability and disability insurance benefits on December 20, 2005, alleging disability

since July 1, 2002, due to severe headaches, pain in her neck and back, and obstructive sleep

apnea.[1]  Her date of birth is September 20, 1964.  (Tr. 57).  She attended school through the

seventh grade.  (Tr. 80).  Her past relevant work experience has been as a fast-food worker, a

cook at a day care center, and as a day care worker.

Bee's claim was denied initially on June 22, 2006, and she filed a timely written request

for a hearing on July 17, 2006.  On October 17, 2007, a hearing was held before the

Administrative Law Judge (hereinafter "ALJ").  (Tr. 366-409).  Claimant, represented by

attorney William J. Ziegler, appeared and testified.  Thomas M. LaFosse, an impartial vocational

---

[1] In addition to the issue of whether claimant was disabled, there was an additional issue of whether the insured status requirements of sections 216(I) and 223 of the Social Security Act were met.  (Tr. 17). The ALJ found that claimant's earnings record shows that she had acquired sufficient quarters of coverage to remain insured through March 31, 2006.

expert, also testified at the hearing.

In her decision dated November 29, 2007, the ALJ determined that claimant's earnings records show that she had acquired sufficient quarters of coverage to remain insured through March 31, 2006. (Tr. 17). The ALJ also determined that claimant was not disabled. (Tr. 17-24). The Appeals Council denied review on July 17, 2008, and claimant timely filed an appeal with this court pursuant to 42 U.S.C. § 405(g).

## *Standard of Review*

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with the relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying the improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir.1986).[2] While substantial evidence lies somewhere between a scintilla and a preponderance, substantial evidence clearly requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Muse*

---

[2] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). The court may not re-weigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey*, 230 F.3d at 136; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343.

*v. Sullivan*, 925 F.2d 785, 789 (5th Cir.1991).

### *Analysis of Impairments*

To be entitled to benefits under the Social Security Act, claimant must prove that she is disabled according to the specifications of the Act. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a); *Anthony v. Sullivan*, 954 F.2d at 292.

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1992).[3] At step one, the ALJ determined that claimant had not engaged in substantial gainful activity during the period from her alleged onset date of July 1, 2002, through her date last insured of March 31, 2006. (Tr. 19). At step two, the ALJ determined that claimant had the following severe combination of impairments: cervical disc herniation, lumbar disc herniation, and right shoulder impingement syndrome.[4] At step three, the ALJ found that the claimant's

---

[3] The procedure is as follows:
1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of medical findings.
2. A person who does not have a "severe impairment" will not be found to be disabled.
3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
4. If a person can still perform his past work, he is not disabled.
5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

[4] *See* 20 C.F.R. § 404.1520©.

3

combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1. (Tr. 20).

The ALJ found that claimant had the residual functional capacity to perform a modified range of light work. She could occasionally stoop, crouch, crawl, squat, and balance. She had limited reaching in all directions. She was precluded from performing complex work.

At step four, the ALJ found that claimant was unable to return to her past jobs as a day care worker/cook and also as a fast food worker because those jobs had requirements which exceed her exertional capacity for light work with limitations on reaching. (Tr. 22). Accordingly, the ALJ determined that claimant was unable to perform any of her past relevant work.

At step five, based on the testimony of a vocational expert, the ALJ determined that claimant had the ability to make a successful adjustment to other work that existed in significant numbers in the national economy.[5] (Tr. 22-3). Thus, the ALJ found the claimant not disabled.

### *Assignment of Errors*

Claimant alleges the following error:[6]

The ALJ erred in failing to properly consider all of claimant's medically-determined impairments at step 2, resulting in findings at steps 3 through 5 of the evaluation process being flawed.

---

[5] The vocational expert determined that the claimant could perform the following jobs: receptionist, surveillance officer, and security guard. (Tr. 23).

[6] *See* claimant's brief. [rec. doc. 7, at 2].

4

## I.    Medical Evidence

**A.  Dr. John Cobb, Lafayette Bone & Joint Clinic**:  Claimant was first seen by Dr. Cobb on June 19, 2002, after being injured in a motor vehicle accident on April 15, 2002.  (Tr. 234).  She complained of headaches and neck and low back pain.  Upon examination, her range of motion was essentially full, with complaints of pain in flexion.  (Tr. 235).  DTR's were 2+, and motor and sensory function was normal.  Lumbar spine had normal posture.  Straight leg raising was negative.  No real neurological symptoms were noted.  Films revealed no bony abnormalities in the cervical spine and a segmental defect with sacralization of the first movable space of the lumbar spine.  Dr. Cobb's impressions were: post-traumatic cervical and lumbar pain syndrome, vague paresthesias in the left arm, no sign of radiculitis, and sprain/strain of cervical and lumbar spine.  (Tr. 236).  He recommended physical therapy and MRI's of the cervical and lumbar spine.

On July 22, 2002, claimant reported several problems: a recurrence of a ganglion cyst in her wrist which had been surgically removed; numbness in her left arm; and back pain.  (Tr. 237).  Upon exam, her motor and sensory function were grossly normal.  Spurling's test was weakly positive.  DTR's were 2+.  Cervical exam revealed some small lateral disc protrusions at the C3-4 and C4-5 levels.  According to Dr. Cobb, the MRI of her back showed two abnormalities: lateral disc bulge at L3-4, and a high intensity zone at L4-5.[7]  (Tr. 237, 259).  The assessment was a disc-related condition, probably at L3-4 and L4-5, with some anterior column

---

[7] Dr. Laborde's lumbar MRI report of July 15, 2002, shows small left lateral disc bulge at L3-4, normal disc space at L4-5, and transitional vertebrae at L5.  (Tr. 259).  His cervical MRI report shows disc herniations with cord displacements at C3-4 and C4-5 with **no** cord compression.

failure. The recommendation was a selective nerve block at C3-4 and C4-5 on the left and also a transforaminal selective nerve block at L3-4 on the left to cover L4-5 as well. (Tr. 238).

On September 11, 2002, claimant presented with complaints of neck and back pain. (Tr. 239). She also complained of insomnia and some degree of positional intolerance. Upon exam, there was some protraction of the head and neck. DTRs were 2+, and motor and sensory function was grossly normal. Strength was 5/5. Dr. Cobb's work-up indicated that claimant had pathology at L3-4 and L4-5 on the left with disc herniations, causing some cord compression. Also, she had a disc protrusion laterally at L3-4. On October 15, 2002, claimant received an epidural steroid injection at Lafayette General Medical Center. (Tr. 260-1). The diagnosis was cervical radiculitis at C3-4 on the left and lumbar radiculitis at L3-4 on the left. (Tr. 260).

On November 25, 2002, claimant presented with continued complaints of pain which were not responsive to conservative care. (Tr. 241). Fusion and diskectomy surgery with instrumentation was planned. Percocet 10 and Halcion were prescribed.

**B. Lafayette General Medical Center**: On March 18, 2003, claimant underwent anterior lumbar interbody fusion at L3-4,[8] anterior cervical decompression, diskectomy and fusion at C3-4, and anterior cervical arthodesis at C4-5, with Drs. John Cobb and Daniel Carroll. (Tr. 221, 222, 232). The preoperative diagnosis was herniated nucleus pulposus at C3-4 and C4-5, anterior column failure at C3-4 and C4-5, segmental instability at C3-4 and C4-5, degenerative disc disease at L3-4, anterior column failure at L3-4, and segmental instability at L3-4. (Tr. 222, 269). Claimant tolerated the surgery well, became ambulatory, and was discharged on March 21,

---

[8] Dr. Cobb's Discharge Summary notes refer to lumbar fusion at L5-S1 (Tr. 215), but Dr. Carroll's Operative Report notes state that the fusion was at L3-4. (Tr. 221).

2003, with a prescription for Lortab 10.  (Tr. 215, 223, 271).  Her final diagnosis at discharge

was symptomatic cervical spondylosis at C3-4 and C4-5 plus symptomatic anterior column

failure at L5-S1.

   **C.  Dr. John Cobb, Lafayette Bone & Joint Clinic, cont.**:  On March 23, 2003,

claimant was seen post-operatively and was fitted for an external bone growth stimulator.  (Tr.

243).  On April 21, 2003, claimant complained of pain, particularly hip pain on her left side.  (Tr.

244).  Medications were refilled.  On May 7, 2003, x-rays of the cervical spine showed healing

without any interval change in hardware.  (Tr. 245).  She was given Percocet[9] for pain.  On July

7, 2003, claimant presented four months post-operatively with healing progressing nicely.  (Tr.

246).  Physical therapy was prescribed.  Halcion[10] and Talacen[11] were prescribed.  On September

23, 2003, claimant was sore and stiff.  (Tr. 247).  Physical exam revealed normal posture, stance

and gait.  Range of motion in the hip was normal, and in the neck was a little guarded.  X-rays

revealed good positioning and healing in cervical and lumbar spine.  The plan was fairly

aggressive physical therapy.  Dr. Cobb opined that claimant was not at maximum medical

improvement at that time, and her back needed another six months to heal.

   On December 22, 2003, claimant continued to complain of symptoms in her neck and

back.  (Tr. 249).  Her x-rays looked excellent in terms of position and healing.  Dr. Cobb

recommended a follow-up MRI of the cervical and lumbar spine.  He had anticipated that she

would have had more improvement than she did by that time.

---

[9] Percocet is a pain reliever used to treat moderate to moderately severe pain.  *www.drugs.com.*

[10] Halcion is a drug used to treat insomnia.  *www.drugs.com.*

[11] Talacen is a pain reliever used to treat mild to moderate pain.  *www.drugs.com.*

On January 28, 2004, her cervical MRI was normal, but the lumbar MRI showed a slight signal uptake in the left graft, suggesting that it was not completely healed. (Tr. 251, 276, 277).[12] The treatment plan was a continued home exercise/physical therapy program.

On April 28, 2004, claimant seemed to be a bit better, but she still had a moderate degree of protraction of her head and neck and some dysrhythm in her lower back. (Tr. 252). She also complained of a lot of insomnia. X-rays showed both lumbar and cervical areas were healing well, and neurological exam indicated normal function of her lower extremity. Dr. Cobb again recommended that she get involved in a home exercise program for her neck and back. Additionally, he suggested a sleep evaluation at Our Lady of Lourdes.

On June 23, 2004, claimant was "getting along reasonably well" but was still complaining of some soreness, aches, and pains in her back along with some muscle spasms. (Tr. 253). Medications included Halcion, Darvocet N100, and Flexeril.

Claimant was not seen again by Dr. Cobb until May 16, 2005, when she presented with persistent neck and right arm pain as well as chronic right knee pain. (Tr. 254). Her back was doing well. Dr. Cobb's examination found her neck to have diminished range of motion. Her cervical exam revealed kyphosis (hunchback) with questionable healing at the 3-4 level. There were some juxtasegmental changes at 5-6. Dr. Cobb noted that "there may be some impingement with the plate." Her symptoms suggested problems with C6 on the right, and Dr. Cobb indicated some concern regarding whether her neck was completely healed, particularly at the 3-4 level.

---

[12] The MRI report stated that there were post-operative changes at L4-5 with fusion and placement of BAK cages, and some epidural asymmetry was noted on the left. (Tr. 277). The report indicated that the significance of those findings was uncertain, and that clinical correlation was necessary.

On June 1, 2005, Dr. Cobb reviewed recent MRI reports and found a probable tear of the lateral meniscus. (Tr. 255, 278). Her cervical MRI showed a slight degree of stenosis at 4-5, but nothing new in terms of the juxtasegments. (Tr. 255, 280). There appeared to be some instability in claimant's lumbar region, but claimant did not have a great deal of neurological complaints.

Claimant's final visit to Dr. Cobb was on March 8, 2006, wherein she stated that she was not improving and continued to have a lot of pain in her neck and down her left arm. (Tr. 258). Additionally, she was having pain in her lower back and into her left hip and buttocks. She complained also of positional intolerance. Upon examination, all reflexes were 2+ with normal strength. Straight leg raises were negative. Dr. Cobb noted that her post-operative MRI of the cervical spine in May, 2005, was normal. His assessment was neuropathic pain of the left upper extremity, post-op lumbar and cervical surgery, which was healed, and residual pain. He indicated that there was no surgical option, and he encouraged claimant to exercise and increase her activities as tolerated. She was given prescriptions for Lyrica and Ultram, was referred back to her family doctor for pain management, and was discharged from treatment.

**D. Dr. Harold Granger**:[13] Claimant presented on March 2, 2004, with right shoulder pain. (Tr. 138). Upon examination, her Clancy test was markedly positive. Her AC joint was very tender. Load shift testing of her shoulder showed a little bit of sublaxation which was not severe. Her x-rays were unremarkable. Dr. Granger's impression was AC synovitis. (Tr. 139). He did not believe that her pain was related to either her motor vehicle accident or to her cervical spine. He injected her AC joint. On June 28, 2004, a follow-up appointment showed that her

---

[13] Dr. Granger is an orthopedic surgeon with Hamilton Medical Group in Lafayette, Louisiana.

supraspinatus outlet and stress testing was mildly positive. (Tr. 140). The Hawkins test was mildly positive also, and the Clancy test was very positive. Claimant stated that the last injection only helped with her pain for a few days. The recommendation was a Mumford procedure[14] with a decompression since she had evidence of impingement syndrome. On October 16, 2004, claimant indicated that she was ready to schedule the surgery for a scope, decompression and arthroscopic Mumford procedure. (Tr. 141). Hawkins and Clancy tests were positive; O'Brien's test was negative. The impression was lateral epicondylitis, impingement syndrome, and AC arthritis. Lortab and Hydrocodone were prescribed. (Tr. 142-3).

At the recommendation of Dr. Granger, claimant underwent arthroscopic decompression surgery on her right shoulder due to impingement syndrome at Park Place Surgery Center on December 13, 2004. (Tr. 169, 174). She tolerated the procedure well and was released with Lortab for her pain. (Tr. 188, 196).

She was seen for follow-up on December 23, 2004. (Tr. 145). She complained of severe shoulder pain, and Mepergan was prescribed. A family member called the doctor's office concerned about claimant's Mepergan prescription because claimant allegedly had some difficulty after her back and neck surgery with "getting off" the pain medication. It was requested that her narcotics be limited. Dr. Granger suggested that after the initial prescription of Mepergan, he would probably switch her to Lortab or something weaker, if need be. He also gave her Flexeril for muscle spasms.

On April 26, 2005, claimant presented with a new problem of pain going down both shoulders, lateral elbows, and posterior aspects of her trapezius. (Tr. 137). The impression was

---

[14] Mumford procedure is arthroscopic resection of the distal clavicle. *www.medscape.com*.

bilateral cervical disc degeneration or sprain, bilateral epicondylitis,[15] and possible fibromyalgia. The right elbow was injected with cortisone, and Relafen and Flexeril were prescribed.

**E. Dr. Ricardo R. Leoni**:[16]  On June 14, 2005, claimant presented with severe neck and right arm pain. (Tr. 206).  Upon exam, her straight leg raising was negative.  She had no weakness in hip flexors, quadriceps, or hamstrings.  Grip strength was normal.  Her bicep and triceps jerks were +2 and +1.  The knee and ankle jerks were +2 and 0.  His impression of a recent MRI was that she may have some foraminal stenosis at L4-5 on the right side.  He asked Dr. Domingue to perform EMG testing.[17]  On August 9, 2005, Dr. Leoni noted that claimant had experienced right arm pain for about three months which was not doing better with conservative treatment. (Tr. 205).  Studies showed osteophytosis at C4-5, right.  He suggested either injections into the AC joint area or a foraminotomy at C4-5.  On September 14, 2005, Dr. Leoni diagnosed C5 radiculopathy on the right, secondary to osteoarthritis. (Tr. 207).  On that day, he performed a microforaminotomy and nerve root decompression at C4-5 on the right, at Lafayette Surgical Specialty Hospital. (Tr. 207-8).

**F. Dr. Toscheiba Holmes, consulting physician:**  Dr. Holmes conducted a physical examination of claimant at the request of Disability Determination Services on April 29, 2006. (Tr. 281).  Claimant presented with complaints of neck and shoulder pain with multiple surgeries.  Claimant stated that she could dress and feed herself, stand for 30 minutes, walk 25

---

[15] Tennis elbow.

[16] Dr. Leoni is a neurological surgeon.

[17] Claimant underwent EMG nerve conduction studies of the right arm and neck on August 5, 2005 with Dr. James N. Domingue (clinical neurophysiologist and neurologist). (Tr. 201-204).  The abnormalities implied a lesion of the right median nerve at the wrist.  There was no clear-cut electrophysiological evidence of radiculopathy.

minutes, sit for 30 minutes, and lift 30 pounds.  She also could drive a car for 25 to 30 minutes.

Her medications were reported as Lyrica, Clonazepam, and Zrytec.

Upon physical examination, claimant ambulated well with a normal gait and no assistive

devices.  (Tr. 282).  She had no problem getting on and off the exam table and up and out of the

chair.  Her motor strength was 5/5 in all extremities, she had intact reflexes, and no sensory

deficits were noted.  Straight leg raises were negative when seated and in the supine position.

Claimant was able to stand on her toes and squat toward the ground.  Range of motions of

cervical spine revealed flexion and extension 45 degrees, lateral flexion 30 degrees, and rotation

to left and right 70 degrees.  Lumbar spine flexion was 90 degrees.  Shoulder flexion was:

forward elevation - right 150 degrees, left 130 degrees; backward extension - right 55 degrees,

left 40 degrees; abduction - right 180 degrees, left 130 degrees; internal rotation - right and left

80 degrees; external rotation - right 90 degrees, left 70 degrees.

Dr. Holmes's impressions were neck pain with multiple surgeries, including a fusion, and

low back pain with previous discectomy and fusion.  (Tr. 283).  There was no evidence of acute

radiculopathy.  Claimant had decreased sensation, but in a non-dermatomal pattern.  She had

upper motor neuron signs, most noted in upper left extremity.  X-rays showed spondylosis of the

cervical and lumbar spine.

### G.  Residual Functional Capacity ("RFC") Assessment

In a Residual Functional Capacity Assessment dated June 20, 2006, a non-examining

DDS internist determined that claimant could lift/carry 20 pounds occasionally and 10 pounds

frequently; stand, walk and sit about 6 hours in an 8-hour workday, and had unlimited push/pull

ability.  (Tr. 287).  It was noted that claimant's statements were credible.  She was able to

perform all postural activities occasionally, except that she could never climb ladders, ropes, or scaffolds. (Tr. 288). The examiner noted that claimant was limited in reaching in all directions. (Tr. 289). She had no limitations with regard to vision, communication, or environment. (Tr. 289-90). It did not appear that the DDS physician had the benefit of reviewing all of claimant's medical records.

**H. Dr. Harold Granger, cont**.: On April 9, 2007, claimant presented with pain in her left shoulder and left knee. (Tr. 313). No trauma precipitated these problems. Her shoulder pain was constant; the knee pain was off and on. Claimant indicated that she was taking no medications at that time. (Tr. 313, 316). Hawkins and O'Brien's tests were positive on the left shoulder and negative on the right shoulder. The diagnosis was left shoulder impingement syndrome with AC arthritis. (Tr. 314). The treatment was a shoulder injection and at-home therapy program.

On April 26, 2007, claimant called the doctor's office complaining that the Tramadol[18] was not helping her pain. (Tr. 312). Darvocet[19] was prescribed, with no refills. On May 16, 2007, claimant called again requesting a refill of the Darvocet. (Tr. 311). Instead, Ultracet[20] was prescribed.

At claimant's follow-up visit on May 21, 2007, the assessment was subacromial bursitis and rotator cuff rupture. (Tr. 310). MRI testing was ordered. On August 13, 2007, claimant's

[18] Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. *www.drugs.com*.

[19] Darvocet is used to treat mild to moderate pain. *www.drugs.com*.

[20] Ultracet is an analgesic combination drug used for short-term treatment (5 days or less) of moderate to severe pain. *www.drugs.com*.

grip strength was 5/5. (Tr. 308). A Hawkins test on her left shoulder was positive. (Tr. 307). She complained of shoulder pain and also hand numbness at night. (Tr. 307-8).

Claimant was seen at NYDIC Open Air MRI on August 17, 2007. (Tr. 320-24). An MRI of the right shoulder showed subscapularis tendinosis, grossly normal superspinatus tendon, and evidence of anterior-superior labral tear which was non-displaced or minimally displaced. (Tr. 302, 322). Further impression was chronic benign appearing 13-16mm degenerative type subchondral cystic defect, posterior superolateral margin of the humeral head deep to the distal infraspinatus tendon. An MRI of the left shoulder found fairly advanced chronic hypertrophic AC joint osteoarthropathy appearing contributory to a moderate degree of impingement, as well as supraspinatus tendinosis with no evidence of tendon disruption or tear, and also findings suggestive of an anterior/superior labral tear. (Tr. 304, 320).

An EMG nerve conduction study was ordered by Dr. Granger at the office of Dr. Stuart Begnaud on August 30, 2007. (Tr. 327-30). The findings were consistent with mild to moderately severe right sided carpal tunnel syndrome. (Tr. 328). It was Dr. Begnaud's opinion that concurrent right sided ulnar C8/T1 radicular process was likely, and also that concurrent right C6/radial muscle appeared to show some involvement, but without any obvious explanation. Another radicular process was within "the realm of possibilities." The left side had no clinical findings.

**I. University Medical Center**: Claimant presented at the emergency room on September 19, 2007, with complaints of a pinched nerve in her neck. (Tr. 344). She stated that she needed an MRI but that her insurance would not pay for it. She listed her medications as Protonix and Chlorazepam. (Tr. 345). X-rays were taken of her neck, and findings included anterior fusion of

14

C3, C4, and C5 with intervening disc spaces narrowed, with intervening disc cages, and reversal of the normal cervical curvature at the fusion. (Tr. 349). Medications were given, including Tramadol and DepoMedrol. (Tr. 346-7). Claimant was released with prescriptions for Flexeril and Ultram. (Tr. 348).

On October 12, 2007, claimant was again seen at the emergency room with complaints of neck pain, cervical and lumbar pain, and also with pinched nerves at her fusion sites and pain in both arms. (Tr. 338, 340). Her medications were listed as Tramadol and Flexeril. (Tr. 339). An MRI of the cervical spine was scheduled for a later date (Tr. 335), and claimant was given prescriptions for the following medications: Methylpred (steroid), Ibuprofen 600 mg, Citalopram 20 mg (for depression), Tramadol HCL 50 mg (for pain), and Cyclobenzapr 10 mg (muscle relaxer). (Tr. 333-4).

## II.     Testimonial Evidence: ALJ hearing on October 17, 2007.

At the hearing, Bee was 43 years old. (Tr. 369). She testified that she was 5 feet 6 inches tall and weighed 150 pounds. She stated that she lived with her husband and had no children. She completed seventh grade and could read and write. (Tr. 370). She stated that her medications made her forgetful. (Tr. 371). She testified that she was taking the following medications: Methaprid, Ibuprofen, Cyclobenzopar, Tramadol, and Ciplopram.

Regarding employment, her first job was at Burger King in 1992, where she cooked and worked the counter for approximately six months. (Tr. 376). She had also worked in two day care centers for at least ten years. (Tr. 372). She stated that she was involved in a motor vehicle accident in 2002; she was hit from behind, and she filed a lawsuit against the other driver. (Tr. 377). The accident totaled her car and also the new suburban of the other driver. (Tr. 390). She

testified that she worked at a day care center up until the date of the accident. (Tr. 373). Her job at the day care included cooking for 200 children, housekeeping, and driving children to and from school in the school van. (Tr. 373-5).

Regarding her pain, claimant reported her worst pain was in her shoulders and her neck. (Tr. 376). She also reported low back pain and pain radiating down her arms and into her hands, which led to pinching and cramping in her hands. She testified that she had to lie down because the pain was so bad. Her neck pain caused headaches, and the only way for her to get relief was to lie down. (Tr. 377). She also has insomnia and sleep apnea. (Tr. 379).

Regarding activities, Smith testified that she could lift ten pounds and could stand for 15 minutes (Tr. 378). She testified that she could sit for 30 minutes at most. She stated that she bathed and dressed herself. (Tr. 379). She testified that she did not do dishes and could get a "light meal" on the table, but only a microwavable dish. (Tr. 380). She grocery shopped sometimes with her husband, but he did all the lifting. She drove a car. (Tr. 381). She read a little and watched TV. (Tr. 382).

Claimant testified that Dr. Cobb told her that the motor vehicle accident which she was involved in had caused injuries to her neck and back which required surgery. (Tr. 383). Accordingly, claimant underwent a surgery which included a neck fusion at levels 3,4, and 5, and also included a lumbar fusion.

In addition to treatment by Dr. Cobb, Dr. Granger treated claimant for her shoulder problem. He referred claimant to a nerve doctor who found arthritis in her left shoulder and carpal tunnel syndrome in her right arm. (Tr. 384). He also indicated that she had a pinched nerve in her right arm. Claimant testified that she underwent surgery on her shoulder in 2004

16

which consisted of a scope and decompression.  (Tr. 385-6).  The impression was lateral epicondylitis, impingement syndrome, and AC arthritis.  Claimant also had neck surgery in 2005 with Dr. Leoni which consisted of nerve decompression at C4-5.  (Tr. 387).

After March 8, 2006, claimant lost her health insurance.  When she obtained new insurance with Blue Cross, she had to sign a rider because she could not get insurance for her pre-existing back and neck problems.  (Tr. 388).  Accordingly, claimant was unable to go back to her previous treating physicians for monetary reasons, and so she went to UMC for her continued back and neck pain.  (Tr. 396).  Dr. Granger had not yet released claimant for her shoulder injuries at that time.  Another MRI was scheduled to take place on October 25, 2007, at UMC. (Tr. 389).

Claimant testified that she had worked at two different day care centers; at one she was a part-time teacher of four year olds; at the other one she was a pre-school art teacher.  (Tr. 392-3). Her records indicate that she worked up until July 2002.  Her day care jobs required her to kneel, lift children, and stand all day.  (Tr. 395).  She also cooked for the children and drove them to and from school in a van.

Vocational expert Thomas LaFosse also testified at the hearing.  (Tr. 393, 396).  Dr. LaFosse stated that claimant's former job as a fast food worker was classified as light duty, SVP 2, unskilled, and her previous job of cook at a day care center was classified as medium duty, SVP 6, skilled.  (Tr. 394).  Clamant's job as a teacher at a day care center was classified as light duty, SVP 3, semi-skilled.

The ALJ reviewed claimant's RFC assessment and posed several hypotheticals in which he asked Dr. LaFosse to assume a person of the same age, education, and work experience as

claimant. The first hypothetical was assuming a person who was able to: supervise and cook for small children; manage her time well; read, write, and use numbers at work; concentrate and persist for two-hour blocks of time between breaks; lift and carry 10 to 20 pounds; stand, walk, and sit six hours a day; occasionally climb stairs, stoop, crouch, crawl, squat, kneel, and balance; no ladders, scaffolds, or dangerous heights; and no dangerous machinery. (Tr. 397).

In response, Dr. LaFosse testified that the hypothetical described someone with a limited range of light-duty work, and that such a person would not be able to do claimant's prior relevant work of cook, kitchen helper, cleaner, or van driver at day care because, that portion of claimant's past relevant work was medium duty. Dr. LaFosse determined that claimant would be precluded from doing her past jobs of fast food worker and teacher due to her limitations on reaching. (Tr. 398). Thus, claimant was precluded from doing all of her past relevant work. Dr. LaFosse testified that there were jobs in the state and national economy that she could perform, such as security guard or gate watcher. (Tr. 398-9).

The ALJ then changed the hypothetical to the exact same exertional level, but with adequate ability to handle detailed instructions as opposed to simple. (Tr. 399). The ALJ indicated that claimant's medications might cause her some memory problems. The VE testified that the "limited reaching" limitation of the hypothetical eliminated all unskilled work at the light and sedentary levels because a person needs 100% usage of his or her upper extremities at the unskilled level. (Tr. 405). Looking at semi-skilled jobs with limited reaching, the VE testified that claimant could work as a surveillance officer or a receptionist, and possibly also as a flagger. (Tr. 405, 407).

Claimant's attorney added to the hypothetical some restrictions on range of motion in the neck. (Tr. 406). In that instance, the VE testified that the jobs of receptionist, security guard, surveillance officer, and flagger would be eliminated. (Tr. 406-7). Claimant's attorney argued that claimant's neck limitations were supported by medical evidence even though these limitations were not listed in the RFC. (Tr. 408).

### ALJ's Decision

As outlined above, the ALJ concluded that claimant was not under a disability within the meaning of the Social Security Act from July 1, 2002, through the date last insured which is March 31, 2006. (Tr. 24).

### Analysis

I.    **Did the ALJ err in failing to properly consider all of claimant's medically-determined impairments at step 2, resulting in findings at steps 3 through 5 of the evaluation process being flawed, thus rendering the ALJ's decision unsupported by the substantial evidence?**

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).[21]  However, the ALJ is entitled to determine the credibility of the examining physicians and medical experts and to weigh their

---

[21] *See also Smith v. Schweiker*, 646 F.2d 1075, 1081 (5th Cir. 1981), *subrogated on other grounds, Hand v. Heckler*, 761 F.2d 1545 (11th Cir. 1985) (The testimony of the treating physician must be given substantial weight unless there is good cause shown to the contrary.).

opinions accordingly. *Greenspan*, 38 F.3d at 237. The weight to be given a physician's statement is dependent upon the extent it is supported by specific clinical findings. *Elzy v. Railroad Retirement Board*, 782 F.2d 1223, 1225 (5th Cir. 1986); *Jones v. Heckler*, 702 F.2d 616, 621 (5th Cir. 1983). An acceptable medical opinion as to disability must be supported by clinical or laboratory findings. *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981).

In *Newton*, the Fifth Circuit, citing 20 C.F.R. § 404.1527(d)(2), held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. 209 F.3d at 456; *see also Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). As provided in the Regulations, the ALJ cannot disregard the treating physician's medical testimony without first evaluating the six factors listed in 20 C.F.R. 404.1527(d). In this case, the ALJ failed to perform this analysis, which was error.

Dr. Granger, one of claimant's physicians who had been treating her for several years, diagnosed claimant with left shoulder impingement syndrome with AC arthritis, subacromial bursitis, and rotator cuff rupture. (Tr. 310, 314). An MRI showed left shoulder impingement as well as supraspinatus tendinosis and possible anterior/superior labral tear. (Tr. 304, 320). There is no medical evidence in the record which is inconsistent with or contrary to Dr. Granger's diagnosis. Quite the opposite, an EMG and nerve conduction study completed by Dr. Stuart Begnaud on August 30, 2007, showed carpal tunnel syndrome, and Dr. Begnaud opined that "radicular process was likely." (Tr. 327-30).

At the time of the ALJ hearing, claimant had not been released from Dr. Granger's care. Nonetheless, the ALJ did not give any weight to the medical findings of Dr. Granger or the medical records from UMC.

Dr. Holmes, the consulting physician, found that claimant had a reduced range of motion in her left shoulder. (Tr. 282). Progress notes from UMC indicated that x-rays showed a "reversal of the normal cervical curvature at the fusion." (Tr. 349). Doctors at UMC ordered another cervical MRI which was scheduled to take place in October, 2007, and claimant was given Tramadol and DepoMedrol. (Tr. 335, 346-7). Because the ALJ did not sufficiently explain his reasons for disregarding the medical findings of Dr. Granger and the medical records of University Medical Center, both treating sources, the ALJ erred in determining claimant's residual functional capacity.

Additionally, the record reflects that claimant was taking several medications, Methylpred (steroid), Ibuprofen 600 mg, Citalopram 20 mg (for depression), Tramadol HCL 50 mg (for pain), and Cyclobenzapr 10 mg (muscle relaxer). (Tr. 333-4). Tramadol is a narcotic-like pain medication designed for the relief of moderate-to-severe pain.[22] Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)). The ALJ did not adequately consider the side effects of claimant's medications on her ability to work, and his failure to do so was error.

---

[22] *See* note 18, infra.

The ALJ indicated at the hearing that claimant's medications might make her forgetful. However, none of claimant's treating physicians have indicated exactly what her work-related limitations are with regard to her medications, if any, despite the introduction of new evidence from at least one of claimant's treating physicians after the ALJ hearing but prior to the decision being rendered in this case.

Remand is appropriate upon a showing of "good cause," which includes an "inability to make a definitive ruling concerning a claimant's disability based on the record before the court." *Ferguson v. Schweiker*, 641 F.2d 243, 250, n. 8 (5th Cir. 1981).[23] Here, the court cannot make such a definitive ruling regarding the claimant, and, thus, the undersigned finds that remand is appropriate.

### *Conclusion*

Considering the claimant's impairments as a whole, I find that the ALJ's determination that claimant retained the residual functional capacity to perform the exertional demands of unskilled light work with additional limitations is not adequately supported by the evidence. (Tr. 23). Although the record contains an RFC assessment, none of the treating physicians have performed an evaluation of claimant's residual functional capacity to perform any work whatsoever. Further, the RFC assessment does not appear to address claimant's continuing shoulder and neck problems. Thus, the undersigned finds that there is not substantial evidence to support the ALJ's current conclusion.

Accordingly, the undersigned recommends that this case be **REVERSED and REMANDED** to the Commissioner for further administrative action pursuant to the fourth

---

[23] *Disavowed on other grounds, Johnson v. Heckler*, 767 F.2d 180 (5th Cir. 1985).

sentence of 42 U.S.C. § 405(g). This includes, but is not limited to, sending the case to the hearing level with instructions to the Administrative Law Judge to obtain a consultative evaluation of claimant's impairments, particularly a residual functional capacity evaluation regarding her shoulder and neck impairments. This also includes instructions to the Administrative Law Judge to obtain a report from Dr. Granger, in which Dr. Granger further explains and supports his conclusions, or to obtain a report from another expert regarding claimant's shoulder and neck impairments. Claimant shall be afforded the opportunity to submit additional evidence and to testify at a supplemental hearing. Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA). See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY**

**FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3d 1415 (5th Cir. 1996).**

Signed this 16th day of September, 2009, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

24